**Below is a Memorandum Decision of the Court.**

*Mary Jo Heston*

**Mary Jo Heston**
**U.S. Bankruptcy Judge**

**(Dated as of Entered on Docket date above)**

# UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

Donald Gene Grant,

                Debtor.

Case No. 23-41833-MJH

**MEMORANDUM DECISION ON REBECA MCALLISTER'S OBJECTION TO DEBTOR'S CHAPTER 13 PLAN.**

    This matter came before the Court for an evidentiary hearing on July 8, 2024, to consider the objection of creditor Rebeca McAllister ("Ms. McAllister") to the confirmation of the Debtor's, Donald Gene Grant's ("Mr. Grant") chapter 13 plan ("Plan"). Ms. McAllister's Objection asserts that Mr. Grant owes her a non-dischargeable, priority domestic support obligation that must be paid in full under the Plan. Based on the evidence presented, including the testimony of Ms. McAllister and Mr. Grant, the parties' admitted exhibits and pre-hearing statements,[1] and arguments of their respective counsel,

---

[1] Ms. McAllister's Pre-Hearing Statement referenced her exhibits as "Movant" and "M-X" in error, and were marked and admitted at the hearing as R-X for Respondent and will be referred to in that manner in this opinion. The Court admitted Ms. McAllister's Exhibits R1-R4.

the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 9014(c)[2] and 7052.

## I.  JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334. Venue is proper before this Court pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), (M), and (O).

## II. BACKGROUND AND FINDINGS OF FACT

### A.  BACKGROUND REGARDING THE PARTIES, THEIR RELATIONSHIP & MARRIAGE

Mr. Grant is approximately 54 years old. *See* Arbitration Decision, Ex. M-7 at 2, ECF No. 21-7. He testified that he is retired from the Army, where he served in Iraq, and that he was hit by an improvised explosive device while driving there and serving in the military police. Mr. Grant further testified that he worked as a prison guard in Pennsylvania before entering the military. As a result of the foregoing, Mr. Grant receives Veterans Administration disability, a small pension from the State of Pennsylvania, and Social Security. While there was no testimony at trial as to the specific amount of Mr. Grant's annual income, the amount, as represented in his bankruptcy schedules, is approximately $73,008, comprised of the foregoing income sources. ECF No. 1 at 39.[3] Mr. Grant testified that he attempted to work as a long-haul truck driver during the parties' relationship but that he did not feel that he could continue safely in this occupation because of the residual effects of the injuries he sustained while driving in Iraq, and accordingly, he stopped. He further stated that he is attending some college classes to complete an associate degree. He is currently unemployed and does not foresee working in the future, particularly at a desk job.

---

[2] Unless otherwise indicated, all chapter, section, and rule references are to the Federal Bankruptcy Code, 11 U.S.C. § 101–1532, and to the Federal Rules of Bankruptcy Procedure, 1001–9037.

[3] The Court takes judicial notice of Debtor's bankruptcy schedules in this case pursuant to Federal Rule of Evidence 201. *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) (holding appellate court may take judicial notice of records of underlying bankruptcy case); *In re Ranieri*, 598 B.R. 450 (Bankr. N.D. Ill. 2019) (bankruptcy court may take judicial notice of its records, including a debtor's bankruptcy schedules).

Ms. McAllister is a widow who is approximately 59 years old. *See* Arbitration Decision Letter, Ex. R-2 at 5, ECF No. 20-2. She testified that she has worked full time for approximately 30 years at Albina Gas in Vancouver, Washington, and makes approximately $22 per hour, equating to approximately $45,760 annually. She testified that she owned her home free and clear of debt before meeting Mr. Grant.

In late 2019, Mr. Grant and Ms. McAllister began a relationship, and Mr. Grant moved into Ms. McAllister's home in January 2020. Ex. M-7 at 2; Ex. R-2 at 6. Mr. Grant and Ms. McAllister were married in Hockinson, Clark County, Washington, on July 18, 2020. Findings and Conclusions about a Marriage Ex. M-9 at 1:21, ECF No. 21-9. The parties separated on February 14, 2021. *Id.* at 1:22-1:23. Ms. McAllister testified that she loaned Mr. Grant money and paid off some of his debts during their relationship to build his credit so they could purchase a marital home. Mr. Grant did not dispute this at the hearing.

## B. THE DIVORCE

On January 5, 2022, Ms. McAllister filed a Petition for Divorce in Clark County Superior Court. Original Divorce Petition: Petition for Divorce, Ex. M-2, ECF No. 21-2. In her petition, Ms. McAllister stated, "Spousal support is **not** needed." *Id.* at 2:15 (emphasis in original).

Mr. Grant testified that in early 2022, he obtained part-time employment to earn money to repay the funds advanced by Ms. McAllister for his benefit. Mr. Grant further testified that from March 2022 through June 2022, he paid Ms. McAllister $1,000 monthly to partially repay her for some of the advanced funds. However, on June 24, 2022, following Mr. Grant's failure to pay the June payment, Ms. McAllister texted Mr. Grant to inform him that she expected to be repaid for all of the funds, advanced during their relationship. Text Message Exchange June 24, 2022, Ex. M-11, ECF No. 21-11.

On August 10, 2022, Mr. Grant filed his Response to Petition about a Marriage in Clark County Superior Court, stating that he agreed that spousal support was unnecessary. Response to Petition about a Marriage, Ex. M-3 at 2:8, ECF No. 21-3. Ms. McAllister

subsequently filed an Amended Petition for Divorce in the Clark County Court, in which she again stated that "spousal support is **not** needed." Amended Petition, Ex. M-4 at 2:11, ECF No. 21-4 (emphasis in original). Mr. Grant's Response to the Amended Petition about a Marriage again stated that he agreed that spousal support was unnecessary. Response to Amended Petition, Ex. M-6 at 2:19, ECF No. 21-6. Ms. McAllister testified, however, that she made those statements in error and did not intend to assert that spousal support was unnecessary.

On February 1, 2023, the Clark County Court entered a Stipulated Order for Mediation/Arbitration. Stipulated Arbitration Order, Ex. M-5, ECF No. 21-5; Ex. R-2 at 1-4. Mr. Grant and Ms. McAllister then engaged in binding arbitration with arbitrator Scott Horenstein (the "Arbitrator"). Stipulated Arbitration Order, Ex. M-5 at 2; Horenstein Declaration, Ex. R-2 at 1-4.

In his April 16, 2023, decision ("Arbitrator Decision"), the Arbitrator found that the relationship between the parties "constitu[ted] a short relationship and marriage." Ex. M-7 at 2; Ex. R-2 at 5. After examining the respective property and debts of Mr. Grant and Ms. McAllister, as presented by Ms. McAllister at the Arbitration, the Arbitrator determined that Mr. Grant should pay Ms. McAllister $107,000 in a "transfer payment" or "equalizing payment." Ex. M-7 at 4; Ex. R-2 at 7*; see also* Ex M-9, Exhibit A. McAllister Proposed Division of Property and Debtors.[4] After adjusting certain amounts based on the parties' clarifications, the Arbitrator stated:

> With those adjustments, the husband's total is $60,000. The wife's total is ($154,565) rounded down. This results in a transfer payment of $107,000 from the husband to the wife. For the husband, if ($107,000) is subtracted from the $60,000 it leaves him a net community estate of ($47,000). For the wife, if she receives $107,000, and that is subtracted from (154,565) that leaves her with a net community estate of ($47,565).

*Id.*

---

[4] The parties testified that the Arbitrator used this exhibit in allocating the debt and assets.

Accordingly, the Arbitrator ordered Mr. Grant to pay Ms. McAllister $1,000 in monthly installments for 107 months, beginning June 1, 2023. *Id.* The Arbitrator also noted, "The parties agreed that if I ordered maintenance, it would be non-modifiable, and it is so ordered." *Id.*

The Arbitrator's Decision was filed with the Clark County Superior Court on April 20, 2023, and on April 27, 2023, Ms. McAllister filed a Declaration in Support of Entry of Decree ("Declaration ISO of Decree"). Declaration ISO Decree, Ex. M-8, ECF No. 21-8. In the Declaration ISO Decree, Ms. McAllister stated: "The division of property and debts contained in the Findings of Fact and Conclusions of Law is a fair and equitable division." Ex. M-8 at 2.

On April 28, 2023, the Clark County Court entered Findings and Conclusions about a Marriage, stating: "While not requested, spousal support should be ordered as a method of reaching an equitable result." Ex. M-9 at 3:1-3:3. The Clark County Superior Court entered the Final Divorce Order ("Divorce Order") on the same day. Final Divorce Order, Ex. M-10, ECF No. 21-10; Ex. R-1. Under the label "Spousal Support," the Divorce Order states that Mr. Grant will pay Ms. McAllister $1,000 in monthly installments for 107 months starting June 1, 2023 ("Debt Obligation"). *Id.* at 2:22-2:26. The Divorce Order also states that the monthly payment requirement "is non-modifiable by stipulation of the parties and will not end upon Petitioner's [Ms. McAllister's] remarriage or the registration of a new domestic partnership." *Id.* at 3:1-3:3.

The Divorce Order also required Mr. Grant to "apply for life insurance on his life in the amount of $107,000 (the payout benefit may decline at the rate of $1,000 per month) due at death" ("Life Insurance Obligation"). *Id.* at 3:6-3:10. Under the terms of the Divorce Order, Ms. McAllister would reimburse Mr. Grant for any expense and premiums payable in connection with any such insurance policy. *Id.* The Divorce Order also required Ms. McAllister to assume $193,932.52 in debt in addition to $53,167 in separate debt. *Id.* at 2:9-2:16; Ex. M-9, Ex. A. Mr. Grant testified that Ms. McAllister she funded this debt by

obtaining a loan secured by her home and that the monthly payment on such loan was approximately $1,700. Ms. McAllister did not dispute this amount, and testified that she had significant difficulty paying the monthly payment on the debt.

The divorce was finalized on April 28, 2023. *Id.* at 1:19. Mr. Grant and Ms. McAllister testified that Mr. Grant did not pay any of the Debt Obligation to Ms. McAllister after the divorce as ordered, and further that he did not perform the Life Insurance Obligation by failing to obtain the court-mandated life insurance policy.

Mr. Grant testified that during his negotiations with Ms. McAllister, he offered to make payments of $500 per month, which he felt he could afford, but that she insisted on $1,000 per month payments, which he stated he didn't feel he could afford. He further testified that he advised Ms. McAllister that he would file for bankruptcy if she insisted on the $1,000 monthly payment. Then, when they could not reach a deal, he did not fight the label provided to the Debt Obligation as set forth in the Arbitration Decision, the Findings of Fact and Conclusions of Law, and the Divorce Order. Mr. Grant opined that Ms. McAllister's insistence on labeling the monthly payment on the Debt Obligation as "maintenance" was for protection in the event of a future bankruptcy filing. Ms. McAllister also testified that she insisted on characterizing the Debt Obligation as support to protect herself because Mr. Grant had filed bankruptcy before.

C. THE BANKRUPTCY FILING AND EVIDENTIARY HEARING

On October 23, 2023, Mr. Grant filed this chapter 13 bankruptcy case and the Plan. Voluntary Petition ECF No. 1 and Plan, ECF No. 6. The Plan states, "The debt owed to Rebeca Lee Grant [McAllister] results from marriage dissolution and is in the nature of property settlement. The balance of the debt not paid through the plan will be discharged." *Id.* at 4.

On the same day, Mr. Grant texted Ms. McAllister to inform her of the bankruptcy case. The text message exchange states the following:

> MR. GRANT: I filed bankruptcy #13. Here's my attorney info. Never contact me again.
>
> MS. MCALLISTER: That doesn't make any difference my spousal support is not cancelled by bankruptcy. THAT is way [sic] I asked for spousal support and it was granted.

Text Message Exchange October 23, 2023, Ex. M-12, ECF No. 21-12; Ex. R-4 at 4, ECF No. 20-4.

On December 13, 2023, Ms. McAllister filed the Objection. Objection to Confirmation, ECF No. 12. On January 30, 2024, Mr. Grant filed a reply to the Objection and a declaration in support of confirmation of the Plan. Reply to Objection, ECF No. 15; Decl. in Supp. of Reply to Obj., ECF No. 16. On February 6, 2024, the Court heard arguments regarding the Plan and determined that an evidentiary hearing would be necessary to determine the dischargeability of the obligation to Ms. McAllister and set an evidentiary hearing for July 8, 2024. Notice of Evidentiary Hearing and Order Setting Deadlines, ECF No. 18. On July 8, 2024, the Court held the evidentiary hearing on the Objection to Confirmation. At the conclusion of the evidentiary hearing, the Court took the matter under advisement.

## III. DISCUSSION AND CONCLUSIONS OF LAW

### A. SECTION 1322(A)(2) REQUIRES PAYMENT IN FULL OF NONDISCHARGEABLE DOMESTIC SUPPORT OBLIGATIONS – IN GENERAL.

In a chapter 13 case, a plan must provide for payment in full of claims entitled to priority under § 507. § 1322(a)(2). Section 507(a)(1)(A) gives first priority to "[a]llowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition . . . are owed to or recoverable by a spouse, former spouse, or child of the debtor[.]" A domestic support obligation ("DSO") is defined in relevant part as "a debt owed to a spouse, former spouse, or child that is "in the nature of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated[.]" § 101(14A).

DSO debts are nondischargeable in chapter 13. § 523(a)(5); § 1328(a)(2). While other non-DSO divorce-related debts that arise from an equitable division of property and debts as defined in § 523(a)(15) are dischargeable in chapter 13 and are not entitled to priority under § 507. § 1328(a)(2); § 507(a)(1). *See also In re Beckx*, No. BAP.CC-08-1193-DCPA, 2000 WL 35888261, at *6 (9th Cir. BAP Mar. 18, 2009). Accordingly, if a debt is not determined to qualify as a DSO, the debtor may treat the debt as a general unsecured debt, entitled only to receive a pro-rata share of the debtor's payments to the unsecured class under the debtor's plan as required by the Code and will be subject to the debtor's discharge upon the debtor's completion of all plan payments.

**1. Ms. McAllister bears the burden of proof on whether the Debt Obligation is a nondischargeable DSO.**

Objections to confirmation of a chapter 13 plan on the basis that a debt qualifies as a DSO substantively are treated the same as objections to dischargeability of such debt filed in an adversary proceeding. *See In re Johnson*, 397 B.R. 289, 295-96 (Bankr. M.D.N.C. 2008) (discussing the nondischargeability distinction between a DSO and property settlement debts in the context of a plan objection). The burden of persuasion rests always on the party asserting that a debt is nondischargeable. *In re Gibson*, 103 B.R. 218, 220 (9th Cir. BAP 1989). The party asserting nondischargeability must prove its case under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279 (1991) (decided under Section 523(a)(2)); *In re Gionis*, 170 B.R. 675, 683 (9th Cir. BAP 1994), *aff'd*, 92 F.3d 1192 (9th Cir. 1996) (applying the preponderance of the evidence standard to § 523(a)(5)). Once the party asserting nondischargeability establishes a prima facie case, the burden of production shifts to the debtor to come forward with rebuttal evidence. *In re Maudsley*, No. ADV. ND-04-01013-RR, 2006 WL 6810971, at *8 (9th Cir. BAP Jan. 20, 2006), *see also In re Crews*, No. 11-45982 CN, 2020 WL 1518534, at *4 (Bankr. N.D. Cal. Mar. 30, 2020). However, the objecting party (i.e., Ms. McAllister) at all times bears the ultimate burden

of proof to establish by a preponderance of the evidence that the debt is a nondischargeable DSO under §§ 523(a)(5) and 1328(a)(2).

**2. The legal framework to determine whether the Debt Obligation is a property settlement or DSO.**

Whether an obligation satisfies the definition of a DSO is a question of federal law. *In re Sternberg*, 85 F.3d 1400, 1405 (9th Cir. 1996), *rev'd on other grounds*; *In re Bammer*, 131 F.3d 788 (9th Cir. 1997). Although not binding on its decision, the Court may look to relevant state law for guidance on issues such as the circumstances that lead to court-ordered support or maintenance. *Gibson*, 103 B.R. at 220. The bankruptcy court is the ultimate decision maker on the factual and legal determinations necessary to decide whether a debt is actually "in the nature of a DSO." *See In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998) (discussing whether an obligation is in the nature of support for purposes of dischargeability under § 523(a)(5)).

In determining whether an obligation is a DSO, "the court must look beyond the language of the decree to the intent of the parties and to the substance of the obligation." *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir. 1984). This is a fact-based inquiry specific to the facts of the case at hand. *Sternberg*, 85 F.3d at 1405 ("The intent of the parties is a factual finding."); *see also Shaver*, 736 F.2d at 1316.

Courts in the Ninth Circuit generally look to the *Shaver* factors in determining how the parties intended to characterize the obligation. *Sternberg*, 85 F.3d at 1405. "Foremost, the trial court should consider whether the recipient spouse actually needed spousal support at the time of the divorce." *Shaver*, 736 F.2d at 1316. In determining whether spousal support was necessary, the court should examine if there was an "imbalance in the relative income of the parties" at the time of the divorce decree. *Id*. The court should also consider whether the obligation terminates upon the death or remarriage of the recipient spouse and whether the payments are "made directly to the recipient spouse and are paid in installments over a substantial period of time." *Id*. at 1316–17. Labels used by

the state court are not binding on the bankruptcy court. *In re Jodoin*, 209 B.R. 132, 138 (9th Cir. BAP 1997). However, the parties' labels for the payments may provide evidence of the parties' intent. *Sternberg*, 85 F.3d at 1405. The *Shaver* factors are evaluated as they existed when the divorce decree was entered rather than when the dischargeability question was addressed. *See In re Combs,* 101 B.R. 609, 615 (9th Cir. BAP 1989) ("the court must ascertain the intention of the parties at the time they entered into their stipulation agreement"). Accordingly, the Court will analyze each *Shaver* factor under the facts of this case to determine the parties' intent as to the nature of the Debt Obligation when the Clark County Court entered the Divorce Order.

**B. APPLICATION OF THE *SHAVER* FACTORS TO THE DEBT OBLIGATION.**

**1. The Label of the Debt Obligation.**

The first *Shaver* factor is the label given to the Debt Obligation when the Clark County Court entered the Divorce Order. The Ninth Circuit has held that while the label alone is inconclusive, it may provide evidence of the parties' intent under some circumstances. *Sternberg*, 85 F.3d at 1405. *See also In re Combs*, 101 B.R. at 615 ("[t]he court should look to the substance of the obligation in the agreement . . . and generally should disregard labels and titles.").

The parties do not dispute that the Divorce Order includes the Debt Obligation under the heading "Spousal Support." In the Clark County Court's findings of facts, the Court states that "[w]hile not requested, spousal support should be ordered as a method of reaching an equitable result." Furthermore, the Arbitration Decision describes the Debt Obligation as "maintenance" throughout. On the other hand, the parties agree that the Debt Obligation arises from payments of Mr. Grant's debts by Ms. McAllister. The Arbitration Decision clearly indicates that the $107,000 amount was reached by equalizing the parties' net community estates. Ex. M-7 at 4; Ex. R-2 at 7. Both the Arbitration Decision and the Clark County Court's findings of fact state that the Debt Obligation was intended to reach an equitable result. Finally, texts sent after Mr. Grant's bankruptcy

filing and Ms. McAllister's testimony indicate that she requested the court to characterize the Debt Obligation as spousal support so it would not be discharged in a future bankruptcy proceeding. Thus, although the Debt Obligation is labeled as a DSO, there is significant evidence in the record indicating that the parties intended otherwise when the Divorce Order was entered. The Court is unpersuaded that the label given to the Debt Obligation in the Divorce Order evidences the parties' intent to treat it as a DSO.

**2. The Debt Obligation does not terminate upon remarriage, but the parties agree that it terminates upon Ms. McAllister's death.**

The next *Shaver* factor is whether the obligation terminates upon the death or remarriage of the recipient spouse. "If an obligation terminates on the death or remarriage of the recipient spouse, courts may be inclined to classify the agreement as one for support." *Shaver*, 736 F.2d at 1314. Property settlements are not generally affected by the death or remarriage of the recipient, but DSO payments are. *Id*. at 1316. Under Washington law, the default rule is that "[u]nless otherwise agreed in writing or expressly provided in the decree the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance or registration of a new domestic partnership of the party receiving maintenance." RCW 26.09.170(2). *See also In re Marriage of Roth*, 72 Wn. App. 566, 569 (1994) (providing an extensive review of Washington caselaw discussing whether the parties "otherwise agreed" to extend maintenance past death or remarriage).

The Divorce Order expressly states that the Debt Obligation will not terminate upon the recipient spouse's remarriage but is silent about whether it ends upon Ms. McAllister's death. Both parties, however, testified that each intended for the Debt Obligation to terminate should Ms. McAllister predecease Mr. Grant. Additionally, the parties agreed to the Life Insurance Obligation to pay the Debt Obligation should Mr. Grant predecease Ms. McAllister. The Court concludes that this factor neither supports nor negates the parties' intent to treat the Debt Obligation as a DSO because the parties agree that Mr.

Grant still owed the Debt Obligation to Ms. McAllister should she remarry, but it does terminate if she predeceases him.

### 3. Mr. Grant was to pay Ms. McAllister directly in equal monthly installments over approximately nine years.

The third *Shaver* factor is whether the debt payment is "made directly to the recipient spouse" and in installments over a substantial period. In *Shaver*, the court noted that support is usually paid directly to the recipient spouse over an extended period. *Id.* at 1317. "Support payments tend to mirror the recipient spouse's need for support." *Id.*

The Divorce Order provides for payment of the Debt Obligation in $1,000 installments over 107 months or approximately nine years, paid to Ms. McAllister directly. While this factor is satisfied in that the payments are being made over a long period of time directly to Ms. McAllister, the Court does not find that this factor supports the existence of a DSO under the facts of this case, especially when one looks at the facts surrounding the Debt Obligation.

First is the discussion of the nature of the Debt Obligation by both the Arbitrator and Ms. McAllister. As a threshold matter, the Court notes that at the outset of the divorce proceedings, each party indicated that spousal support was unnecessary. However, that is not dispositive to this factor because the question is whether Ms. McAllister needed the support because of an imbalance of economic circumstances. Economic circumstances relevant to the analysis include the property owned, debts, and income. More importantly, the Arbitrator's Decision throughout refers to the Debt Obligation as a "transfer payment" or "equalizing payment." Ex. M-7 at 4; Ex. R-2 at 7*;* Ms. McAllister in Declaration ISO Decree, Ex. M-8, ECF No. 21-8. This characterization is supported by the statement: "The division of property and debts contained in the Findings of Fact and Conclusions of Law is a fair and equitable division." Ex. M-8 at 2.

Second is the short period of time the parties were in a domestic partnership or marriage. The Arbitrator found that the relationship between the parties "constitu[ted] a

short relationship and marriage." Ex. M-7 at 2; Ex. R-2 at 5. Washington state law stands for the general proposition under RCW 26.09.090 that marriages of shorter duration tend not to give rise to DSO awards. *See* RCW 26.09.090(1)(d); *In re Marriage of Terry*, 79 Wn. App. 866, 869 (1995); *In re Marriage of Sheffer*, 60 Wn. App. 51, 55 (1990). *But see Washburn v. Washburn*, 101 Wn.2d 168, 179 (1984) ("The factors listed in the statute are not exclusive").

Finally, the Court notes that the length of time for payment of the Debt Obligation appears to be related to the significant amount of the Debt Obligation (i.e., $107,000) and the time necessary to repay such a large obligation given Mr. Grant's income rather than suggesting that the Debt Obligation is in the nature of a DSO.

In sum, the Court concludes that while the technical application of this *Shaver* factor is met, the Court is unpersuaded that this factor supports a finding that the parties intended that the Debt Obligation is a DSO.

**4. Ms. McAllister's Need for Support at the Time of the Divorce.**

The fourth *Shaver* factor in this case is whether the recipient spouse needed spousal support or maintenance at the time of the divorce. *Sternberg*, 85 F.3d at 1405; *Shaver*, 736 F.2d at 1316. This requires the Court to examine whether there was an imbalance in the spouses' economic circumstances at the time of the divorce. *Id.* at 1317. The balance of economic circumstances (not just an imbalance of income as Ms. McAllister suggests) is in accord with Washington state law. *Stacy v. Stacy*, 68 Wn.2d 573, 577 (1966); *DeRuwe v. DeRuwe*, 72 Wn.2d 404, 408 (1967) ("[I]t is the economic condition in which the decree will leave the parties that engenders the paramount concern in providing for child support and alimony and in making a property division."); *Washburn*, 101 Wn.2d at 181.

At the time of the divorce, Ms. McAllister retained ownership of the home located at 16600 NE 186th Ct. Brush Prairie, WA 98606, which had been her separate property prior to her marriage to Mr. Grant. Ms. McAllister agreed to take on all community debts, totaling approximately $193,932.52 in the divorce, which was paid through a lien on her

home, resulting in monthly payments of approximately $1,700. She also owned a vehicle valued at $39,367, while Mr. Grant owned a truck valued at $60,000. Mr. Grant did not own any real property and thus was required to rent a place to live following the parties' separation. Ex. M-7 at 3; Ex. R-2 at 6. Ms. McAllister's average annual income was approximately $45,000, and Mr. Grant's is estimated at approximately $70,000.

Although an evident income disparity of approximately $35,000 per year existed between the parties, this factor weighs in favor of characterizing the Debt Obligation as a property settlement because it was meant to equalize the parties' overall economic circumstances, including their expenses and income at the time of the divorce. Moreover, given the lack of any record of Ms. McAllister's need in the Arbitration Decision and Ms. McAllister's failure to provide any significant independent evidence of her need other than her own statement that she could not afford the debt payment secured by her home, the Court finds that this factor weighs in favor of characterizing the Debt Obligation as a property settlement, not a DSO.

### 5. Analysis of the *Shaver* factors indicates that the parties intended the Debt Obligation to be a property settlement.

Bankruptcy provides orderly collection for creditors, facilitates efficient and fair reorganization, and discharges debts not required to be paid through bankruptcy to give the debtor a fresh start. The Court recognizes that, in some instances, the application of the Code, which affects non-bankruptcy legal obligations, may seem unfair or inequitable to those affected, including Ms. McAllister. The Court, however, is required to apply the law as written to the facts of the case in accordance with the allocation of the burden of proof. In conclusion, based on the application of the *Shaver* factors to the facts in this case, the Court finds that Ms. McAllister has failed to satisfy her burden of proving by a preponderance of the evidence that the Debt Obligation is in the nature of a DSO and holds that the Debt Obligation is a non-priority dischargeable debt under § 1328(a), making § 1322(a)(2) inapplicable to Ms. McAllister's claim.

**C. The Life Insurance Obligation is Not a Debt Subject to the Discharge.**

At the evidentiary hearing, the Court indicated that it was treating the Life Insurance Obligation as a separate obligation from the Debt Obligation for dischargeability purposes. The specific question the Court raised is how this bankruptcy affects the Life Insurance Obligation. The Court provided the parties with an opportunity to brief this issue, which the parties indicated was unnecessary. The parties instead addressed the issue in oral argument at the hearing.

Under § 524(a), a discharge operates as a permanent injunction against any attempt to collect or recover on a prepetition debt. *In re American Hardwoods, Inc.*, 885 F.2d 621, 626 (9th Cir. 1989). The Code defines debt as "liability on a claim." § 101(12). A claim is defined as the following:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

§ 101(5).

While Congress intended in § 101(5) to incorporate the broadest available definition of a claim, *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991), equitable remedies that do not result in any avenue for a creditor to obtain a right to payment are not dischargeable. *See In re Irizarry*, 171 B.R. 874, 878 (9th Cir. BAP 1994) (holding that the equitable remedies of cancellation of the grant deed, recovery of property, and cancellation of liens are not claims or debts subject to discharge); *see also In re Ward*, 194 B.R. 703, 708 (Bankr. D. Mass. 1996) (holding that the creditor held a dischargeable claim because it possessed a right to money damages or an injunction against the debtors for breach of the noncompetition provision in a franchise agreement). In sum, if the creditor cannot reduce

its claim to an enforceable right to payment through an equitable remedy, it is not subject to a debtor's discharge in bankruptcy.

Under the terms of the Divorce Order, Ms. McAllister's only remedy is to file an action in state court seeking enforcement of the Life Insurance Obligation as an equitable remedy. Neither the Arbitration Decision nor the Divorce Order provides for the right to monetary damages for Mr. Grant's nonperformance of the Life Insurance Obligation, nor is any other remedy available that would give rise to a right of payment because Mr. Grant is obligated to apply for the life insurance and provide the relevant information on such application. Furthermore, Ms. McAllister must pay for any expenses and any premiums related to any insurance policy purchased. Based on these facts, it is clear that the Life Insurance Obligation is inherently not monetary in nature. Accordingly, the Court concludes that the breach of performance of the Life Insurance Obligation is not a debt or liability on account of a claim within the meaning of § 101(5) and, therefore, it is not subject to discharge under § 524(a).

## D. CONCLUSION

In conclusion, the Court holds that Mr. Grant's $107,000 Debt Obligation owed to Ms. McAllister arising from the Divorce Order is not a DSO but is instead the type of debt defined under § 523(a)(15). Accordingly, the debt is subject to discharge pursuant to § 1328(a) following Mr. Grant's completion of all payments under the Plan. Section 1322(a)(2) is inapplicable to Ms. McAllister's claim, and her Objection, as applicable to the Debt Obligation, is overruled. The Court concludes that the Life Insurance Obligation is not a debt subject to discharge.

/ / / End of Memorandum Decision / / /